[Crim. No. 4562.   Second Dist., Div. Three.   Aug. 20, 1951.]

THE PEOPLE, Respondent, v. EVA MARIE KELLER BECKER, Appellant.

Al Matthews, Doris R. Baker, Harold J. Ackerman and Robert P. Dockeray for Appellant.

Edmund G. Brown, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was accused of murder. Trial by jury was waived. She was adjudged guilty of murder in the first degree and was sentenced to life imprisonment (the sentence to run concurrently with a sentence she was then serving in the penitentiary). She appeals from the judgment, sentence, and order denying her motion for a new trial.

Her contention is that the evidence is insufficient to support the judgment; and that, even if the evidence is sufficient to support a conviction of murder, it is not sufficient to support the finding of murder in the first degree.

Defendant, formerly known as Eva Marie Keller, and Max E. Keller (the deceased) were husband and wife and they lived at 401 West Ramona Boulevard in Wilmar until they separated in 1944. Then he lived at that address and she lived in their mountain cabin at Crestline.

On January 24, 1947, about 8 a.m., a telephone repair man went to the home of Max Keller to test whether the receiver

was off the telephone hook. No one responded to his knocks at the front and back doors, and he did not see anyone on or near the premises, but he determined from a test made outside the house that the receiver was off the hook of an extension telephone in a building at the rear of the house and that the telephone service at that address was a one-party line. He testified that when the receiver is off the hook of the extension telephone in the rear building a person cannot telephone from the house. The next day, January 25th, about 9 a.m., another telephone repair man went to said address to restore the receiver to the hook. He knocked on the front and side doors of the house, and then (without going into the house or the building) he disconnected the extension telephone (which was in a workshop at the side of the garage) and thereby made the house telephone usable. A next door neighbor came out, and the telephone man explained what he was doing.

Mrs. Zinnen, who lived next door to said address, saw the telephone man at the Keller house on January 25th and she talked with him. She had last seen Mr. Keller on January 23d about 5:30 p.m., at which time he was in his kitchen shaving, and she was in the dining room of her home. On January 25th, after seeing the telephone man, she became suspicious, and then she and her mother walked around the Keller house to see if the doors or windows were open, but they did not find any of them open. She (Mrs. Zinnen) looked in the window of the workshop and noticed that the telephone receiver was off the hook. She then had a conversation with a neighbor, Mr. Ellsworth, who lived across the street, and he walked around the Keller house to see whether he could open any doors or windows, but he did not find that he could enter through any of them. Then, by using a stepladder and a pry bar, he raised the kitchen window, which is above the sink and about 6 feet above the driveway, and entered the house through that window. He went through various rooms and upon opening the door of the den he saw the body of Mr. Keller on the floor of the den in front of a closet door. Mr. Ellsworth then left the house by going through the kitchen window. He told Mrs. Zinnen what he had learned, and then he went home and telephoned to the sheriff's office.

Two deputy sheriffs arrived at the Keller house about 10:50 a.m., and Mr. Ellsworth climbed through the kitchen window and opened a door. Then they followed him to the den and

saw the body of Mr. Keller on the floor in front of a closet. After ascertaining that Mr. Keller was dead, they made a search of the body, the room and the house for a weapon, particularly a gun, but they did not find any weapon. They found that all the doors of the house were locked and the windows were closed securely or locked. The door of the closet was open and there was a bullet hole in the door. The bullet had gone through the door, the Venetian blind, the windowpane and screen, and outwardly into the yard. On the ground beneath the shattered window they found a .38 caliber slug. They searched the house for a pocketbook but none was found. The bullet hole in the door was 3 feet 9 inches above the floor. Two other deputy sheriffs arrived at 11:35 a.m. They searched every room in the house, all the clothing in the house, the clothing worn by the deceased, the garage, the workshop, the automobile and truck in the garage, and they found no gun or wallet. They observed that the telephone receiver was off the hook of the telephone in the workshop.

The chief autopsy surgeon of the coroner's office, who performed an autopsy on the deceased, testified that the immediate cause of death was hemorrhage due to a gunshot wound of the chest and neck; that one wound was through the soft tissues of the neck, severing blood vessels and fracturing the fifth cervical vertebra, and the other wound was through the heart and the lower lobe of the left lung. The two bullets were found in the soft tissues of the body at the back of the neck and chest. There were no powder flecks at the entrance of either wound, but the margins of the entrances were seared. The wounds were not contact bullet wounds—that is, they were not the kind of wound that results when the gun is held against the skin.

On January 23, 1947, between 9 p.m. and 9:30 p.m., Mr. House, who lived about 437 feet from the Keller house, testified that at said time he was at home and he heard what he thought were three shots, and the first two were pretty close together, and there was a pause and then another one.

Mr. Blaine, the employer of deceased, testified that he saw Mr. Keller on Thursday, January 23, 1947, about 5:15 p.m., when he (deceased) left the place of employment at the Farmer's Market in Los Angeles; he had known deceased three or four months, and on many occasions he had seen the pocketbook (Exhibit 5 hereinafter referred to) in possession

of the deceased; he noticed particularly the ten-pointed star on the pocketbook.

A gasoline station operator in Wilmar testified that he knew the deceased and defendant; on January 22 or 23, 1947, in the late afternoon, when it was getting dark, deceased came into the station and bought gas; deceased was excited and nervous; he left his wallet on the counter, but about 15 minutes later he returned and asked the operator to cash a check for him; the check, which was for $50 or $60, was cashed and the deceased put the money in his wallet; when he started to go, the wallet which had quite a bit of money in it was left on the counter again; the wallet was similar to the wallet involved herein (Exhibit 5). He also testified that about a week thereafter the defendant came to the station in an automobile and asked him if the officers had questioned him about Mr. Keller; when he told her they had, she asked him what he said and what he knew about it; he said he did not remember the conversation with the officers; she said, ''Well, the officers are trying to pin this thing on me,'' and ''the night Max got killed I was in a hospital out in Hollywood.''

Two deputy sheriffs, who were at the Keller house in the morning of January 25, 1947, went in the afternoon of that day to Crestline to talk with defendant; she was at the home of Mr. Kellogg in Crestline, and they talked to her in front of his cabin; they told her they were deputy sheriffs of Los Angeles County and were conducting an investigation; they asked permission to search her car, and she gave that permission, but nothing was found in the car; the officers and defendant went to the town of Crestline where they had a further conversation. One of the deputies asked her if she could account for her movements for the last two or three days and she said she could; he asked her to start with Thursday afternoon, January 23, 1947; she said that from 7 p.m., January 23d, until 8 a.m., January 24th, she remained at her cabin in Crestline; she had no visitors during that time; about 8 a.m., on January 24th, she went to the home of Mrs. Ferguson in Crestline and took Mrs. Ferguson's daughter to school; then she went to a drugstore; then she went to a restaurant in San Bernardino, then she took some chickens from her frozen food locker to a hospital in San Bernardino; about noon she went to a beauty parlor in San Bernardino and remained there about two hours; then she was at Dr. Savage's office from 3 p.m. to 5 p.m. approximately; then she was in her attorney's office in San Bernardino until 6:30 p.m. approxi-

mately; then she went with Mr. and Mrs. Ferguson to the Royal Palm and remained there rather late, and then went to the Fergusons' home where she slept that Friday night. They asked her if she ever owned any guns; she said the only guns she knew anything about were a .22 rifle, a .22 B-B gun, and an old rusty gun which she had given to a druggist in Crestline in December, 1946. They asked her if she had had any difficulties with Mr. Keller, and she said she had not. They asked her if she had had any quarrels with him. She said that shortly after midnight on January 1, 1947, she had gone to the Keller house in Wilmar to wish him a Happy New Year, that he noticed her about the premises and came out of the house, they had a conversation, a fight ensued and he struck her several times on the leg with a crowbar. She said she had not been in that vicinity since that time. When they began the conversation with her, they did not say anything in regard to Mr. Keller and did not tell her that he had been killed. Near the end of the conversation, one of the deputies told her that her husband had been shot, and she replied: "Oh, no, he cannot be dead. You are joking."

On January 18, 1947, defendant was in the office of her physician Dr. Savage, and he found that on her legs below the knees there were bruises which had become infected, and he sent her to a hospital in San Bernardino. She was in the hospital from January 18th to January 21st. According to the doctor's direction, she also went to his office on January 22d and 24th.

On March 12, 1947, the said officers, in the presence of two other officers and a deputy district attorney, had a conversation with defendant at the sheriff's office in Hollywood. She was not under arrest. They asked her where she was on the night of Thursday, January 23, 1947. She said she had gone to two shows in San Bernardino; she had gone to the Fox Theater about 6 p.m., but she left it early because she didn't like the picture; after she left there she ate a hamburger at a restaurant; then, about 8 p.m., she went to the Ritz Theater. They asked her if she knew the name of the picture there, and she said she did not know it. In response to leading questions as to the names of the pictures at that theater and what the pictures were about, she said the cartoon was about a big dog named "Pluto," that she thought one picture was "Decoy," and that one was "The Time, The Place and The Girl." She said she left the Ritz Theater about midnight, and after she had been away from the theater about five minutes, and while

she was driving toward her home, she noticed that she had lost her scarf; she then returned to the Ritz Theater and knocked at the front doors, which were locked, and attracted the attention of the manager and told him she had lost her scarf; then she and the manager and the janitor proceeded to the seating area in the theater, and the janitor found her scarf and returned it to her; the manager told her he was glad that she found the scarf; then she went home. One of the officers asked her if she remembered a conversation with him on January 23 (25), 1947, at Crestline, and she said that she remembered it. He asked her if she didn't tell him at that time that on Thursday night, January 23, 1947, she had remained at home at Crestline the entire night. She replied that he must have misunderstood her.

The assistant manager of the Ritz Theater testified that the pictures showing at that theater on January 23, 1947, were "Decoy" and "The Time, The Place and The Girl"; the picture "Decoy" was not shown after 5:30 p.m. of that day; the show was over at 11:55 p.m.; about midnight, after the doors were locked, he heard knocking at the front door; he opened the door and saw the defendant who said that she had lost her scarf in the theater and she would like to go in and get it; he let her in, but he did not accompany her or see what she did; after that, she said she found her scarf, and while she was putting it on she left the theater. He also testified that he knew her before said January 23d; that months before that date she told him that she and her husband were split up, that he was running around with teen-age girls and she did not like that.

The janitor of the Ritz Theater testified that after the show was over on the night of January 23, 1947, a lady, who was "similar" to defendant, knocked at the door of the theater and said she had lost her scarf and asked him if she might look for it; he gave her permission and she went ahead of him; she bent over between the seats, then straightened up and said she had found the scarf; then she went out of the theater. He did not find the scarf; the first time he saw it was when she had it in her hand.

The distance between the Keller house and the Ritz Theater is about 50 miles. An officer testified that he drove from that house to the sheriff's office in San Bernardino (about four blocks from the theater) in approximately one hour and seventeen minutes without driving over 50 miles per hour.

On May 23, 1947, two deputy sheriffs, the defendant and her attorney met by prearrangement at the Keller house. Defendant then said she was going to search the house in an attempt to find letters or notes that might have been left by the deceased. The officers followed her while she searched various areas about the house and garage. While at the garage she showed them a barrel, and stated that it was the place where, two days previously, she found a capsule in which there was some writing that she had identified as the writing of the deceased. (The article referred to as a capsule is a tube that is covered with material which appears to be imitation leather. The capsule, with the writing therein, had been delivered previously to the officers by defendant's attorney.) That writing is Exhibit 24. The officers then showed the writing to her and asked her if she could identify it, and she replied that it was the writing of the deceased. Then she looked in one or two places in the garage, and then she went into the bathroom and she looked under the washbowl and found another note, Exhibit 25. It is toilet paper about a yard long upon which there is writing. Defendant handed the note to one of the officers, and he asked her if she could say whose writing it was. She looked at the note and said in her opinion it was the writing of the deceased. One of the officers then obtained practically the same length of paper and asked her if she would write the contents of Exhibit 25, and she replied that she would. He dictated the note to her and she wrote it while he dictated. That paper, with her writing thereon, is Exhibit 26. When the defendant's attorney delivered the capsule to the officers he also delivered to them several letters which were written by the deceased to defendant. Those letters were placed in evidence as exemplars of decedent's handwriting. Also, several documents were received in evidence as exemplars of defendant's handwriting, and it was stipulated that those exemplars (Exhibit 33) were in defendant's handwriting.

An examiner of questioned documents, who was qualified to testify as a handwriting expert, testified that he had examined Exhibits 24, 25, 26 and the exhibits which were the exemplars of decedent's handwriting and of defendant's handwriting; that he examined those exhibits for the purpose of determining who wrote Exhibits 24 and 25; that in his opinion Exhibits 24 and 25 are in the handwriting of defendant and that Max E. Keller, the deceased, did not write them.

Exhibit 24 (the writing which was in the capsule) is as follows:

"To whom It May Concern

"Everett and my attorney and the Doctor Day colled on me the wanted me to Dress, it was past 3 a.m. I am on the floor, I afraid something will happen. I cannot see clear. The tolk about money and will The are made because I did not wanted to kill my wife, I am not sure to do thise thinks but There may be is a other solution. If the make my wife a widow pleace send for my B. to stand by her. My Dearest I love her so. Max E. Keller

My will is not to be changed. M E Keller 23-47"

Exhibit 25 (the writing on the toilet paper) is as follows:

"To my Honey!

"I wrote you 5 letters last week look for, my attorney B. Everett J. and Doctor D. they got me out of bad they want me to write a will, put I want the old will to be the right one. Ball have me sign papers Everett said now I'll get the Keller woman Now I can pay back. The after you to, the get me, for Barbara told Everett I will not harm you, the was together after my money Ball got $7930.00 and about $1000, for his fee."

"Dearest Honey I love you get my Brother to help you.

"Well I have to say good By and Good night my love Thousand Kisses, they are calling well say goodby to Bethle and the children be careful stay in Boulder Creek pay for me tell Charley & Lillian good by for me Darling forgive me if you can Remember me to every body

"Till we meet again

"Yours as ever always loving Hubby

"Get money out of Truck in Garage you will ned it."

On January 21, 1947, defendant filed a verified complaint for divorce in San Bernardino County. She alleged therein that she and the deceased were the owners of community property consisting of the following: four parcels of real property of the total value of $37,700, subject to encumbrances totaling $10,000; personal property consisting of furniture, tools, automobile, and truck of the total value of $4,100; life insurance policies in the approximate amount of $15,000; and cash in possession of deceased in excess of $5,000. In that complaint she asked the court to award all the community property to her.

On October 24, 1948, the seven-room house, in which defendant was living in Crestline, was destroyed by fire. Mr.

and Mrs. Zinnen (who lived next door to the Keller house in Wilmar) and Mr. and Mrs. McHolland owned a mountain cabin in Crestline. On October 27, 1948, the defendant, who had married Mr. Becker, asked Mrs. Zinnen for the use of the Zinnen-McHolland cabin for two weeks until they could find a place to live which was near Mr. Becker's work. Mrs. Zinnen granted the permission and gave the cabin keys to her.

An arson investigator for the National Board of Fire Underwriters investigated the cause of the fire which burned defendant's house. On December 9, 1948, while the defendant, the arson investigator, a deputy sheriff and Mr. Becker were on the way to the sheriff's office in San Bernardino, the defendant requested that they stop at a certain cabin in Crestline (the Zinnen cabin) for the purpose of releasing a cat. They replied that they would do that in the morning. The next day, December 10th, the investigator, the officer, defendant's husband and the fire chief at Crestline went to the Zinnen cabin. They did not have a key, and they cut the lock and entered the cabin. The gas in the gas range was burning. They released the cat, turned the gas off, put another lock on the door, and delivered the key to the justice of the peace at Crestline.

On December 16, 1948, two deputy sheriffs, the fire chief and the arson investigator entered the cabin just referred to. They searched the cabin, looking for a gun. Clothing and numerous boxes were on the bed and davenport, and things in the cabin were in disorder. In one of the boxes there was an old wallet (Exhibit 5), but no significance was attached to it at that time and it was left there and picked up later. While searching the bed, they rolled the mattress about halfway back and there, in the middle of the bed between the mattress and the springs, they found a package which was wrapped with tissue paper and bound by wire and thread. Inside the wrapping there was a .38 caliber Smith & Wesson revolver (Exhibit 12) which was encased in two gloves (Exhibit 13)—they were ladies' right-hand gloves and one glove was over the back part of the gun and the other one was over the front of it. The gun was not loaded. Some of the numbers on the gun had been punched out, but the last three numbers thereon could be seen.

A ballistics expert fired four test bullets from the revolver (Exhibit 12) and compared them with the two bullets which

were taken from the body of the deceased. He testified that in his opinion the two bullets which were taken from the body of the deceased were fired from that revolver. He also testified that he attempted to make a comparison with the bullet which was found on the ground beneath the shattered window of the Keller house, but it was impossible to arrive at any conclusion due to the distorted condition of that bullet; that said bullet was of the same caliber as the bullets which were taken from the body of the deceased.

A firearms identification officer testified that he fired a bullet from said revolver; he compared that bullet with the bullets which were taken from the body of the deceased; that in his opinion the bullets which were taken from the body of the deceased were fired from the revolver, Exhibit 12.

Mrs. Zickert testified that she visited the defendant and Mr. Keller at their home in Crestline in 1945; one night there was a disturbance in a nearby cabin and the defendant suggested that they investigate the disturbance. Defendant went into the bedroom and came back with a gun; Mr. Keller asked her where she got the gun, and she replied that she got it from some person, but the witness (Mrs. Zickert) did not remember the name stated by defendant; then defendant, Mr. Keller and the witness went out and made an investigation; when they returned to the house, Mr. Keller asked defendant if the gun was registered and numbered; Mr. Keller took the gun, said the numbers had been scratched off, and asked the witness if she could read any of the numbers. She (the witness) noticed that a number on the barrel had been scratched and was not discernible; and the gun, Exhibit 12, is similar to the gun which she saw at said time.

Mrs. Dorosh, a daughter of defendant, testified that at Christmas about 1939 or 1941 or 1942 the defendant gave a wallet to Mr. Keller, and she also gave a wallet to Mr. Petrichello, who was then the husband of the witness (Mrs. Dorosh); the wallet which defendant gave to Mr. Keller at said time is the same as the wallet, Exhibit 5, herein; that a week before Mr. Keller was killed she saw a wallet in his possession and that wallet was of the same appearance as the wallet (Exhibit 5); that while she was living at the home of defendant and Mr. Keller, from 1935 to 1938, the defendant insisted that a younger sister of the witness wear gloves; that the gloves which the sister wore at that time were similar in appearance to the gloves herein, Exhibit 13.

Mr. Petrichello testified that defendant gave him a wallet

at Christmas in 1940 or 1941; and at that time she also gave a wallet, which is Exhibit 5, to Mr. Keller.

Mrs. Zinnen testified that she had not seen the revolver, Exhibit 12, before October, 1948; that, insofar as she knew, the revolver was not in the cabin (Zinnen-McHolland cabin) when she was there about Labor Day in 1948; that her husband did not own the revolver; and she had never seen it in the possession of the McHollands. Mrs. McHolland testified that during 1948 she was at the cabin several times, and the last time she was there in that year was after Labor Day when she was there one week; she was there in May or June, 1948, and at that time she turned the mattresses on the beds, and she did not see a gun under either mattress; she never saw the revolver, Exhibit 12, in the cabin; that, insofar as she knew, the revolver was not in the cabin at any time she was there; that she never saw the gloves, Exhibit 13, prior to the preliminary hearing, and she did not place them in the cabin.

Defendant did not testify or offer any evidence.

Appellant contends, as above stated, that the evidence was insufficient to support the judgment of conviction of murder. She argues to the effect that the evidence does not place her at the Keller house at the time Mr. Keller was killed; that no one saw her at or near the house at that time; that the fact that the revolver, wallet and gloves were in the cabin where she was living did not justify a finding that she was at the scene of the murder; and that other persons had occupied the cabin as recently as September, 1948. She made contradictory statements as to where she was the night Mr. Keller was killed. The revolver with which he was shot was found in the cabin where she was living, and it was wrapped in gloves which were similar to gloves defendant had possessed several years previously. It could be inferred reasonably that the wallet which was found in the cabin was the wallet which Mr. Keller had in his possession within a few days or hours preceding his death. The notes (Exhibits 24 and 25), found by the defendant in the Keller house and workshop while she purportedly was hunting for notes that might have been left by the deceased, which notes purportedly were written by the deceased to reveal the circumstances confronting him just before his death, were in fact written by the defendant in an attempt to make evidence that would exculpate her. It could also be inferred reasonably that the incident relative to defendant's going to the theater in San

Bernardino after midnight to get her scarf was designed to create a false impression that she was at the theater at the time Mr. Keller was killed. It is unnecessary to refer specially to other evidence hereinabove detailed. The evidence was ample to support the conviction of murder.

■ Appellant asserts, as above stated, that in any event the evidence was not sufficient to justify a finding of murder in the first degree. Mr. Keller and appellant had not been living together for many months prior to January 23, 1947. There was ill feeling between them. According to a statement made by defendant to the officers, Mr. Keller had struck her on the legs with a crowbar a few weeks before the murder. The divorce complaint filed by the defendant two days before the murder shows that the deceased and defendant owned property of considerable value and she was claiming that all of the property should be awarded to her. Inferences which could reasonably be drawn from the evidence establish a deliberate and premeditated purpose to kill Mr. Keller. Some of the evidence which is the basis for such inferences is evidence pertaining to: the locked condition of the Keller house; the undisturbed condition of the furniture therein; the receiver off the hook of the extension telephone in the workshop which prevented use of the telephone in the house; the preparation by defendant for asserting as an alibi that she was at a theater; the preparation, "planting," and finding by defendant of the alleged final notes of the deceased; and the many false statements of defendant as to where she was on the day the murder was committed. Furthermore, the defendant did not testify or offer any evidence. The evidence was ample to support the conviction of murder in the first degree.

The purported appeal from the sentence is dismissed. (See *People* v. *Tallman,* 27 Cal.2d 209, 215 [163 P.2d 857].)

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.

The opinion was modified to read as above printed and a petition for a rehearing was denied August 31, 1951.

Appellant's petition for a hearing by the Supreme Court was denied September 17, 1951.